Filed 3/6/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| VFLA EVENTCO, LLC,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, et al.,<br><br>    Defendants and Respondents. | B323977<br><br>(Los Angeles County<br>Super. Ct. No. 20SMCV00933) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mark H. Epstein, Judge. Affirmed.

Carlton Fields, Harvey W. Geller, and Steven B. Weisburd for Plaintiff and Appellant.

Wilson Sonsini Goodrich & Rosati, Susan K. Leader, Conor D. Tucker, and Stephanie V. Balitzer for Defendant and Respondent William Morris Endeavor Entertainment, LLC.

Shapiro Arato Bach, Cynthia S. Arato, Julian S. Brod, and Avery D. Medjuck for Defendant and Respondent Big Grrrl Big Touring, Inc.

Law Offices of Max J. Sprecher, Max J. Sprecher; Meloni & McCaffrey, and Robert S. Meloni for Defendants and Respondents Starry US Touring Inc. and Kali Uchis Touring, Inc.

_____

Plaintiff and appellant VFLA Eventco, LLC (VFLA) sued defendants and respondents Starry US Touring, Inc. (Starry US), Kali Uchis Touring, Inc. (Kali Uchis Touring), Big Grrrl Big Touring, Inc. (Big Grrrl), and William Morris Endeavor Entertainment, LLC (WME) for various causes of action related to $6 million in deposits paid to secure the performances of Ellie Goulding, Kali Uchis, and Lizzo at VFLA's music festival scheduled for June 2020.[1]

As a result of the COVID-19 pandemic and in compliance with the government restrictions meant to mitigate the pandemic, VFLA cancelled the festival and demanded the return of the deposits from WME, who negotiated the performance contracts and held the deposits as the artists' agent. VFLA claimed its right to the deposits under the force majeure provision in the parties' performance contracts, which determined the parties' rights to the deposits in the event of a force majeure cancellation. The artists refused VFLA's demand, claiming VFLA bore the risk of a cancellation due to the pandemic.

VFLA sued the artists for breach of contract and breach of the implied covenant of good faith and fair dealing. VFLA also sued WME for conversion, money had and received, unfair business

---

[1] We refer to the producers Starry US, Kali Uchis Touring, Big Grrrl, and their respective performers collectively as "the artists" unless otherwise necessary.

2

practices, and declaratory relief. The trial court granted summary judgment in favor of the artists and WME, finding VFLA bore the risk of the festival's cancellation, and that WME could not be held liable as an agent for the actions of its principals.

For the reasons stated below, we hold the trial court properly granted summary judgment in favor of the artists and WME. The force majeure provision is not reasonably susceptible to VFLA's interpretation, and, in any event, the parol evidence favors the artists. Further, we also hold the artists' interpretation does not work an invalid forfeiture or make the performance contracts unlawful. Since VFLA conceded that, if the artists prevailed, WME should prevail as well, we affirm the judgment in its entirety.

## BACKGROUND

### I.   Virgin Fest and the performance contracts

In December 2019, VFLA publicly announced Virgin Fest Los Angeles (Virgin Fest), a two-day music festival, scheduled for June 2020 in Los Angeles.[2] In February and March 2020, VFLA entered into performance contracts with Starry US, Kali Uchis Touring, and Big Grrrl to secure the performances of Ellie Goulding, Kali Uchis, and Lizzo respectively.

As the artists' agent, WME negotiated the performance contracts with VFLA. The performance contracts contained a "Role of Agent" provision, providing: "[WME] acts only as agent for Producer and assumes no liability hereunder and in furtherance thereof and for the benefit of [WME], it is agreed that neither Purchaser nor Producer/Artist will name or join [WME] . . . as a

---

[2]    The facts are taken from VFLA's opposing separate statements to Big Grrrl's, Kali Uchis Touring's, Starry US's, and WME's motions for summary judgment.

party in any civil action or suit anywhere in the world, arising out of, in connection with, or related to any acts of commission or omission pursuant to or in connection with this Agreement by either Purchaser or Producer/Artist."[3]

Each performance contract also included an identical addendum titled the "Virgin Fest Los Angeles—Festival Rider" (the Virgin Fest riders). The Virgin Fest riders contained a force majeure provision, providing: "A 'Force Majeure Event' means any act beyond the reasonable control of Producer, Artist, or Purchaser which makes any performance by Artist impossible, infeasible, or unsafe (including, but not limited to, acts of God, terrorism, failure or delay of transportation, death, illness, or injury of Artist or Artist's immediate family (e.g., spouses, siblings, children, parents), and civil disorder). In the event of cancelation due to Force Majeure then all parties will be fully excused and there shall be no claim for damages, and subject to the terms set forth herein, Producer shall return any deposit amount(s) (i.e., any amount paid to Producer pursuant to the Performance Contract prior to payment of the Balance) previously received (unless otherwise agreed). However, if the Artist is otherwise ready, willing, and able to perform Purchaser will pay Producer the full Guarantee unless such cancellation is the result of Artist's death, illness, or injury, or that of its immediate family, in which case Producer shall return such

---

[3] "Purchaser" refers to VFLA. "Producer" refers to either Starry US, Kali Uchis Touring, or Big Grrrl, and "Artist" refers to either Ellie Goulding, Kali Uchis, or Lizzo. "Guarantee" does not mean "non-refundable," rather, it is a term of art meaning the deposits are a flat amount and not tied to a percentage of the ticket sales.

4

applicable pro-rata portion of the Guarantee previously received unless otherwise agreed."

WME's representative, Steve Gaches, and VFLA's representative, Tim Epstein, negotiated the Virgin Fest riders. Gaches and Epstein had negotiated festival riders in the past, including a recent festival rider for the Baja Beach festival in Mexico (the Baja Beach rider). Gaches and Epstein used the Baja Beach rider as a starting point for the Virgin Fest rider.

The original draft of the Baja Beach rider's force majeure provision read: "A 'Force Majeure Event' means any act beyond the reasonable control of Producer, Artist, or Purchaser which makes any performance by Artist impossible, infeasible, or unsafe (including, but not limited to, acts of God, terrorism, failure or delay of transportation, death, illness, or injury of Artist or Artist's immediate family and civil disorder[)]. In the event of cancellation due to Force Majeure then all parties will be fully excused and there shall be no claims for damages. However, if the Artist has commenced performance prior to such cancellation, Purchaser will pay Producer the full Guarantee."

Gaches invited Epstein to make edits to the draft Baja Beach rider. Epstein sent back a redline version of the draft, which contained the following italicized changes to the force majeure provision. "In the event of cancel[l]ation due to Force Majeure then all parties will be fully excused and there shall be no claim for damages, *and subject to the terms set forth herein, Producer shall return any deposit amount(s)* (*i.e., any amount paid to Producer pursuant to the Performance Agreement prior to payment of the Balance*) *previously received* (*unless otherwise agreed*). However if the Artist has commenced performance (*i.e., performance at the venue*) prior to such cancellation, Purchaser will pay Producer the

5

full Guarantee *unless such cancellation is the result of Artist's death, illness, or injury, or that of its immediate family, in which case Producer shall return such applicable pro-rata portion of the Guarantee previously received unless otherwise agreed.*" Gaches accepted these changes, but proposed replacing the provision that the artists would get paid in full only if they had "commenced performance" before the force majeure cancellation with a clause allowing the artists to keep the deposit if they were "*otherwise ready, willing and able to perform.*" Gaches told Epstein the revision was "the best we can do for this one," indicating WME had a "new directive" with respect to international travel shows. Epstein agreed to Gaches's revision. Gaches and Epstein then used the Baja Beach rider's force majeure provision for the Virgin Fest riders.

Under the terms of the performance contracts, VFLA transferred to WME's trust account the sums of $400,000 for Kali Uchis, $600,000 for Goulding, and $5 million for Lizzo. The performance contracts provided the deposits were nonrefundable unless otherwise agreed. The deposits were consideration for the artists' performance at Virgin Fest, as well as for exclusivity and advertising rights. The exclusivity rights prohibited the artists from publicly performing or announcing any public performance within a certain geographic area and within a certain period with respect to Virgin Fest. Each artist also granted VFLA the right to use her image, name, and likeness for Virgin Fest's marketing and advertising materials.

## II. Virgin Fest's cancellation and VFLA's demand for the deposits

In March 2020, the State of California and the County and the City of Los Angeles issued a series of orders to limit the spread

6

of COVID-19, including the City of Los Angeles's various "Safer at Home" orders.  The orders prohibited "all indoor and outdoor public and private gatherings and events."  On May 8, 2020, the City of Los Angeles informed VFLA that it would be extending an existing Safer at Home order "to a future date to be determined" and that Virgin Fest would "not be allowed as originally planned" for June 2020.  The next day, VFLA publicly announced that "[a]s a result of the governmental restrictions and mandates resulting from the [COVID-19] pandemic, [Virgin Fest] in Los Angeles is prevented from proceeding as scheduled next month."

Thereafter, VFLA demanded the return of deposits from WME, taking the position that the government's orders and underlying COVID-19 pandemic conditions qualified as a force majeure event, making the artists' performances impossible, and that, accordingly, the deposits should be returned.  VFLA also informed all performers, who were represented by WME and who were contracted to perform at Virgin Fest, that it would take legal action if the deposits were not returned.  Each WME client returned the deposits to VFLA except for Ellie Goulding, Kali Uchis, and Lizzo, who disputed VFLA's interpretation of the force majeure provision.

### III.   Procedural history

In response, VFLA sued the artists for breach of contract and breach of the implied covenant of good faith and fair dealing.  VFLA also sued WME for conversion, money had and received, violating Business and Professions Code section 17200, and declaratory relief.

After extensive discovery, the artists and WME moved for summary judgment.  VFLA also moved for summary adjudication on its breach of contract cause of action against the artists.  The

7

artists argued the proper inquiry under the force majeure provision in determining whether they were entitled to keep the deposits was whether they were ready, willing, and able to perform but for the force majeure event. They claimed, among other things, the term "otherwise" meant "apart from" and was not susceptible to any other interpretation in light of the force majeure provision's "death, illness, or injury" exception.

VFLA claimed the force majeure provision's "otherwise ready, willing, and able" condition meant the artists were ready, willing, and able to perform "in spite of" the force majeure event. Therefore, because the government orders and underlying COVID-19 pandemic prevented the artists' performances, the artists could not satisfy the condition they were "ready, willing, and able to perform." VFLA also claimed the artists' "but for" interpretation resulted in an unlawful forfeiture and made the performance contracts unlawful.

WME filed its own motion for summary judgment, arguing, among other things, it was not liable as the artists' agent for what was essentially a contract dispute between VFLA and the artists. WME further argued it could not be held liable for its principals' decisions to not return the deposits because WME's conduct was not independently wrongful or tortious.

The trial court granted the artists' and WME's motions for summary judgment and denied VFLA's motion for summary adjudication. It held the artists' interpretation did not result in an invalid forfeiture, nor did it make the agreements unlawful. In interpreting the force majeure provision, the trial court found the language was susceptible to either VFLA's or the artists' interpretation, and turned to parol evidence. The trial court explained and the parties agreed, since the parol evidence was

8

undisputed and the parties had waived their right to a jury, the trial court could choose from conflicting inferences and interpret the performance contracts as a matter of law.

The trial court found the original draft of the force majeure provision favored the festival organizer, but was revised to become more artist-friendly, noting the artists could only keep the deposit under the original force majeure provision if they "commenced performance" while under the revised version, they could keep the deposit if they established they were "otherwise ready, willing, and able to perform." The trial court considered other parol evidence, but found it unpersuasive as it could support inferences in favor of either side's interpretation.

The trial court also decided WME's motion on the merits even though VFLA conceded WME should prevail if the artists prevailed on their motion. Although WME raised numerous arguments, the trial court found one determinative—WME could not be held liable as an agent for the actions of its principals under the performance contracts' role of agent provision. Further, WME had not engaged in any independently wrongful or tortious conduct.

VFLA appealed.

## DISCUSSION

### I.     Standard of review

Summary judgment is proper "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A party seeking summary judgment "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th

9

826, 850.)  A defendant meets this burden by showing that plaintiff "has not established, and cannot reasonably expect to establish" an essential element of his claim.  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

We review a grant of summary judgment de novo, which means we "decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law."  (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) In deciding whether a material issue of fact exists for trial, we "consider all of the evidence set forth in the papers, except the evidence to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence." (Code Civ. Proc., § 437c, subd. (c).)

## II.    The artists' "but for" interpretation of the force majeure provision is the only reading that avoids surplusage and gives meaning to every clause

When interpreting a contract, we try "to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.)  If the contract language "is clear and explicit, and does not involve an absurdity," the language governs the interpretation.  (Civ. Code, § 1638.)  And, if possible, "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone."  (Civ. Code, § 1639.)  We interpret the contract as a whole "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.)  We will avoid an interpretation "that leaves part of a contract as surplusage."  (*Rice v. Downs* (2016) 248 Cal.App.4th 175, 186.)  We also interpret a contract to "make it lawful, operative, definite, reasonable, and capable of being carried

10

into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.) We will also avoid interpretations that render the contract "unusual, extraordinary, harsh, unjust or inequitable [citations], or which would result in an absurdity." (*Harris v. Klure* (1962) 205 Cal.App.2d 574, 578.)

Here, the force majeure provision is three sentences. The first sentence defines a force majeure event as "any act beyond the reasonable control of Producer, Artist, or Purchaser which makes any performance by Artist impossible, infeasible, or unsafe." The first sentence then provides examples of a force majeure, including, "acts of God, terrorism, failure or delay of transportation, death, illness, or injury of Artist or Artist's immediate family, . . . and civil disorder." Here, the parties do not dispute that the COVID-19 pandemic and government orders meet the definition of a force majeure.

The second sentence states the artists shall return the deposits to VFLA in the event of a force majeure cancellation, providing: "In the event of cancel[l]ation due to Force Majeure then all parties will be fully excused and there shall be no claim for damages, and subject to the terms set forth herein, Producer shall return any deposit amount(s) (i.e., any amount paid to Producer pursuant to the Performance Contract . . .) previously received . . . unless otherwise agreed." Like the first sentence, the parties do not dispute the meaning of the second sentence, that is, VFLA is entitled to the deposits in the event of a force majeure cancellation unless another term of the performance contract applies.

The third sentence, which is at the heart of the parties' dispute, reads: "However, if the Artist is otherwise ready, willing, and able to perform[,] Purchaser will pay Producer the full Guarantee unless such cancellation is the result of Artist's death,

11

illness, or injury, or that of its immediate family, in which case Producer shall return such applicable pro-rata portion of the Guarantee previously received unless otherwise agreed." The first part of the third sentence thus creates an exception to when the artist must return the deposit to VFLA in the event of a force majeure, that is, when the artist can show he or she was "otherwise ready, willing, and able to perform." The second part of the third sentence creates an exception to that exception, providing that the artist must return the deposit to VFLA when the force majeure cancellation is a result of the artist's "death, illness, or injury, or that of its immediate family."

The parties' disagreement over the force majeure provision and the determination of which party keeps the deposit in the event of a force majeure cancellation can be summarized as follows.

The artists claim their right to the deposits is conditioned on them demonstrating they were "ready, willing, and able to perform" *but for* the occurrence of the force majeure event. According to the artists, the word "otherwise" modifies the adjectives "ready, willing, and able," and when "otherwise" modifies an adjective it means "in all ways except the one mentioned." In other words, the controlling question is, had the force majeure event not occurred, would the artists have been ready, willing, and able to perform.

On the other hand, VFLA claims the artists' right to retain the deposits is conditioned on a showing that the artists were "otherwise ready, willing, and able to perform" *in spite of* the occurrence of the force majeure. In other words, VFLA asserts the use of the word "however" at the beginning of the third sentence connects the "ready, willing, and able" condition to the force majeure event in the prior two sentences, meaning the artists must

12

show they are "otherwise ready, willing, and able to perform" notwithstanding or regardless of the force majeure.

We hold the artists have the better interpretation. The artists' interpretation is the only reading of the force majeure provision that gives effect to all three sentences, including the exception to the exception, i.e., a cancellation that is the result of a force majeure that is the artist's death, illness, or injury, or that of the artist's immediate family. Further we hold the artists' interpretation is the only interpretation that makes the force majeure provision capable of being carried into effect while remaining true to the parties' intent to allow the artists to retain the deposits at least in some circumstances in the event of a force majeure cancellation.

While VFLA's reading appears reasonable at first glance, it suffers from two fundamental problems. It makes the force majeure provision indefinite and incapable of being carried into effect (Civ. Code, § 1643) and deprives the third sentence of any meaning thus rendering it surplusage (*Rice v. Downs*, *supra*, 248 Cal.App.4th at p. 186). Under VFLA's interpretation, we are unsure, and VFLA has not explained, how the artists could ever establish their right to the deposits by showing they were "ready, willing, and able to perform" in spite of a force majeure event when a force majeure event is defined as any act making the artists' performance "impossible, infeasible, or unsafe." This begs the question, in the event of a force majeure that results in cancellation of the festival or the individual artists' performances, how could the artists ever show they were able to perform notwithstanding the occurrence of an event that made their performances impossible, infeasible, or unsafe?

13

None of VFLA's arguments or hypotheticals answer this question. Nor has VFLA identified any scenarios where the artists would definitively have the right to retain the deposits in the event of a force majeure cancellation. For example, VFLA claims the artists "*might* still be able to establish they were 'ready, willing, and able' to perform" in the face of force majeure events such as "terrorism," a "failure or delay of transportation," or "civil disorder" which "*might* result in the cancellation of Virgin Fest." Each of these examples hypothesizes a force majeure event smaller in scope than the COVID-19 pandemic, impacting Virgin Fest only indirectly. The problem with these examples, however, is either VFLA decides not to cancel Virgin Fest because the venue or area where Virgin Fest was set to take place is not impacted, in which case the force majeure provision does not apply, or, if Virgin Fest or the artists' performances are cancelled, VFLA never explains how the artists could show they were otherwise able to perform notwithstanding a force majeure event that rendered the artists' performances or the festival itself infeasible or unsafe.

VFLA asserts what distinguishes its hypotheticals from what occurred here is that the COVID-19 related orders had the unique effect of rendering the artists' performances " 'illegal' " and " 'unlawful' " at the times and places set forth in the performance contracts. According to VFLA, when the force majeure event makes the underlying performance illegal, the artists can never be "ready, willing, and able to perform." However, the definition of a force majeure event does not distinguish between something that makes the performances illegal versus something that makes the performances impossible, unsafe, or infeasible. We find VFLA's distinction is without a difference and leads us back to the same fundamental problem with VFLA's reading—if a force majeure

14

event makes the artists' performances "impossible, infeasible, or unsafe," the artist can never show how they are otherwise able to perform in the face of a force majeure.

As such, VFLA's interpretation of the force majeure provision is neither definite nor capable of being carried into effect without violating the intention of the parties, which was to allow the artists to keep the deposits in at least some circumstances. (See Civ. Code, § 1643.)

The problem with VFLA's "in spite of" interpretation becomes clearer when we consider a force majeure event that is the artists' death, illness, or injury. VFLA's reading is untenable considering the artists could never be "otherwise ready, willing, and able to perform" in spite of a force majeure event that was their own death, illness, or injury, which are expressly defined as force majeures in the provision's first sentence. But, putting that logical fallacy aside, VFLA's right to the return of deposit in the event of a cancellation due to the artists' or artists' immediate family members' death, illness, or injury is already provided for in the first two sentences of the provision. Thus, under VFLA's reading, the second part of the third sentence, i.e., the exception to the exception, adds nothing to the meaning of the force majeure provision despite Epstein and Gaches specifically negotiating that term. Accordingly, VFLA's interpretation makes the third sentence of the force majeure provision surplusage. (*Rice v. Downs*, *supra*, 248 Cal.App.4th at p. 186.)

VFLA also raises its own surplusage argument, contending if the parties intended to create a "but for" test, they would have done so in one sentence reading: "VFLA bears all risk of a force majeure cancellation except one based on the Artist's death, illness, or injury, or that of its immediate family." This is not a surplusage

argument, but a claim the parties could have drafted the force majeure provision more clearly and concisely. While that is undoubtedly true, the issue is not which party could have drafted a shorter more comprehensible force majeure provision. Indeed, VFLA's interpretation could also have been one sentence that read: "[I]n the event of cancellation due to force majeure, producer shall not be paid and shall return any deposit amounts unless the artist is ready, willing, and able to perform in the face of the force majeure event." The issue is which party's interpretation gives effect to each part of the force majeure provision and the contract as a whole, which VFLA's interpretation cannot do. (Civ. Code, § 1641; *Rice v. Downs*, *supra*, 248 Cal.App.4th at p. 186.)

Accordingly, we hold the artists' "but for" interpretation of the force majeure provision is the only correct reading that gives meaning to each part of the provision and makes it definite and capable of being carried into effect while reflecting the intention of the parties.

## III. The parol evidence favors the artists' "but for" interpretation

Even assuming the force majeure provision is reasonably susceptible to VFLA's interpretation, that is, the word "otherwise" only modifies the condition that the artists are "ready, willing, and able to perform," and the word "however" relates back to the force majeure, providing the artists must show they are "ready, willing, and able" notwithstanding the force majeure, we would still affirm the trial court's grant of summary judgment as the parol evidence, to the extent it favors either side, tends to favor the artists' interpretation.

When the language in a contract is reasonably susceptible to either parties' interpretation, the court may look to parol evidence,

16

including the surrounding circumstances of the negotiations; the contract's object, nature, and subject matter; and the parties' subsequent conduct. (*Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 979–980.)

## A. VFLA has not identified material conflicts in the parol evidence

In looking at the parol evidence, we must address a threshold issue identified by VFLA, which is whether the trial court resolved conflicts in the parol evidence that should have been reserved for trial.[4]

In evaluating the extrinsic evidence, the court engages in a three-step process. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126–1127 (*Wolf*).) "First, it provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.] If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract. [Citations.] When there is no material conflict in the extrinsic evidence, the trial court

---

[4]    In its summary judgment order, the trial court noted it had extensive discussion with the parties during oral argument concerning its authority to decide between conflicting inferences, stating "[t]he bottom line is that because contract interpretation is for the [c]ourt (and doubly so here where the parties have waived a jury), the [c]ourt can choose from conflicting inferences even on summary judgment. However, if the inference to be used depends on the resolution of factual disputes concerning the parol evidence, then resolution must await trial."

17

interprets the contract as a matter of law. [Citations.] This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence [citations] or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation." (*Ibid.*)

VFLA cites several examples in the record where it claims the trial court erroneously resolved conflicts in the parol evidence. VFLA's citations do not support its claim of error.

VFLA first cites to the declarations of Epstein and Jason Felts, VFLA's chief executive officer, which according to VFLA, the trial court ignored even though they gave accounts of "what was said and not said" between VFLA and WME during negotiations. Specifically, Epstein stated he never discussed the meaning of the phrase "otherwise ready, willing, and able" with Gaches or anyone else at WME, and he never agreed to and was unaware of the artists' interpretation that "otherwise ready, willing, and able" meant ready, willing, and able but for the occurrence of the force majeure. Similarly, Felts stated he never agreed VFLA would bear the risk of cancellation due to a force majeure.

The record shows the trial court reviewed the Epstein and Felts declarations, but excluded them to the extent they were the declarants' undisclosed understanding of the parties' agreements, stripped of any supporting evidence that those understandings were disclosed during negotiations. The trial court's exclusion of this evidence was not error. "California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation' [citation]. The parties' undisclosed intent or understanding is irrelevant to contract interpretation." (*Founding Members of the Newport Beach*

18

*Country Club v. Newport Beach Country Club, Inc.* (2003)
109 Cal.App.4th 944, 956 (*Newport Beach Country Club*).) As the
trial court properly excluded Epstein's and Felts's undisclosed
understandings of the force majeure provision, they are insufficient
to raise a conflict in the parol evidence or a triable issue of fact.
(See *id.* at p. 960.)

VFLA responds by directing us to the artists' argument that,
if we agree with VFLA on appeal and reverse the trial court's grant
of summary judgment, we must remand the matter for a bench trial
because the artists successfully defeated VFLA's motion for
summary adjudication with a material disputed fact. VFLA
reasons, because the artists' motion is "the mirror image of VFLA's
motion and both motions are based on the same evidence, the same
triable issue of fact that the [a]rtists claim prevents summary
judgment for VFLA must also preclude summary judgment for the
[a]rtists." Specifically, the artists rely on Gaches's testimony that
he told Epstein, and Epstein agreed, the artists must be paid in the
event of a force majeure cancellation with only narrow exceptions.
Meanwhile, as described above, Epstein denies Gaches ever
disclosed this understanding.

While we agree with VFLA that this testimony is conflicting
and related to the parties' negotiations, it is not grounds for
reversal.

As an initial matter, we note VFLA never raised this issue in
the trial court. In its opposition to the artists' motion for summary
judgment, VFLA did not point to any disputes in material fact.
" 'Though this court is bound to determine whether defendants met
their threshold summary judgment burden independently from the
moving and opposing papers, we are not obliged to consider
arguments or theories, including assertions as to deficiencies in

19

defendants' evidence, that were not advanced by plaintiffs in the trial court.' [Citation.] 'Ordinarily the failure to preserve a point below constitutes a [forfeiture] of the point.' " (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 698.) Because VFLA never directed the trial court to this apparent disparity in Epstein's and Gaches's accounts, its contention on appeal that this conflict created a triable issue of material fact is forfeited. (See *ibid.*)

However, even if VFLA had preserved this argument, we would not remand for a bench trial. This is because, even if we drew an inference in favor of VFLA and assumed the truth of Epstein's version of events, i.e., that Gaches never disclosed his understanding of the force majeure provision and Epstein never agreed to the artists' interpretation, the purported conflict is immaterial to VFLA's argument. (See *Villalobos v. City of Santa Maria* (2022) 85 Cal.App.5th 383, 390.) Even if Gaches never disclosed his understanding of the agreement, this fact is immaterial to the court's interpretation. (*Newport Beach Country Club*, *supra*, 109 Cal.App.4th at p. 960.) Conversely, when considering the artists' opposition to VFLA's motion for summary adjudication, we would have to draw an inference in the artists' favor as the nonmoving party. (See *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 470.) And by drawing an inference that Gaches informed Epstein of his understanding the artists had to be paid in the event of a force majeure, we would have to find the artists carried their burden in opposing VFLA's motion. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 846.) Thus, contrary to VFLA's suggestion, this apparent conflict in Gaches's and Epstein's testimony is not a two-way street resulting in a triable issue of fact in VFLA's favor.

VFLA's remaining examples of purported conflicts in the parol evidence are not persuasive. Our review of the evidence shows the evidence was undisputed and therefore the trial court could choose between conflicting inferences and interpret the contract as a matter of law. (*Wolf*, *supra*, 162 Cal.App.4th at pp. 1126–1127.)

For example, VFLA cites to evidence that Kali Uchis chose to return a deposit to another festival organizer even though the agreement for that festival contained the same force majeure language as the Virgin Fest rider. This evidence, however, was undisputed and considered by the trial court, who found it did not necessarily require an inference in favor of either side given the additional reasons Kali Uchis returned that deposit, making those circumstances materially different than the facts here.

VFLA also claims there was conflicting parol evidence regarding an e-mail from Ellie Goulding's agent, stating: "With [the City of Los Angeles] extending [the] stay at home order through July, Virgin Fest has been forced to cancel due to [force majeure]. With no current plans to reschedule, we need to proceed with the process of returning the deposit currently held by WME." Like VFLA's Kali Uchis example, this parol evidence was undisputed.

VFLA also points to an e-mail exchange between Lizzo's agent and Felts, regarding Lizzo's intent to publicly perform in light of the COVID-19 pandemic. In the exchange, Felts asked the agent about Lizzo's public statement that "it's time to stop performing due to [COVID-19]." The agent responded that Lizzo intended to move forward with her confirmed engagements, and she was "ready, willing, and able to play . . . as soon as the [government] says we can." Again, this evidence was undisputed.

21

We are also not persuaded by VFLA's argument that summary judgment should be reversed because the trial court "ignored" evidence submitted by VFLA. While the trial court's order does not refer to every piece of evidence submitted by VFLA, any purported error is harmless where, as here, our independent review establishes the validity of the judgment. (*Goldrich v. Natural Y Surgical Specialties, Inc.* (1994) 25 Cal.App.4th 772, 782.)

In sum, VFLA has not identified any material conflicts in the parol evidence. Therefore, the trial court was authorized to choose between conflicting inferences and interpret the contract as a matter of law. (See *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1341–1342.)

## B. The parol evidence supports the artists' interpretation

Having found the parol evidence was undisputed, we also conclude, to the extent the evidence supported either side's interpretation, it tended to favor the artists' reading.

Most notably, we find Gaches's revision of the force majeure provision during the parties' negotiations particularly persuasive to the artists' position. Gaches revised the condition that the artists had to be paid in the event of a force majeure cancellation only if they "commenced performance" to the condition that they needed to be "otherwise ready, willing, and able to perform." Gaches explained the revision was "the best we can do for this one," based on a "new directive" from the head of WME's music department in light of the fact that Baja Fest was an international, i.e., higher risk

22

festival.[5]  Although the extent of this change is contested, it certainly shifted some risk from the artists to the festival organizer. To accept VFLA's interpretation, we would have to conclude Gaches's revision made it less likely, indeed, potentially impossible, for the artists to demonstrate they were "otherwise ready, willing, and able to perform" in the face of a force majeure, which was clearly not the intention of the parties.  Thus, the issues with VFLA's interpretation of the force majeure provision notwithstanding, there is simply no inferences to be drawn in VFLA's favor on this evidence.

With respect to the remaining parol evidence identified by VFLA, we agree with the trial court's assessment that it is not particularly persuasive to either side's position.

For example, VFLA argues the parol evidence shows that "prior to the instant litigation, WME and the [a]rtists interpreted the [f]orce [m]ajeure [p]rovision the same way as VFLA; namely, without a 'but for' exception."  VFLA directs us to the parol evidence that other WME clients chose to return the deposits to VFLA. VFLA also again cites to Kali Uchis's decision to return the deposit to the other festival organizer even though that performance contract contained the same force majeure provision at issue here.

The record shows VFLA has taken this evidence out of its broader context.  For example, it was undisputed that the deposits paid to the other performers were far less than what was paid to Ellie Goulding, Kali Uchis, and Lizzo.  Thus, while it is possible to interpret the performers' decisions to return the deposits as

---

[5]     Although the term "higher risk" was not contained in the draft comments, Epstein testified that it was communicated to him that international also implied higher risk in this context.

supporting an inference that WME and its performers initially agreed with VFLA's interpretation of the force majeure provision, it is also equally reasonable to assume these other performers returned the deposits to avoid a costly litigation after VFLA threatened legal action. Moreover, it was undisputed WME advised its clients that they had the option of returning the deposits to avoid a public dispute that would result in litigation. As for Kali Uchis's decision to return the deposit to the other festival organizer, the record shows Kali Uchis's return of the deposit was contingent on the other festival organizer working with her in good faith to reschedule the performance. Given this additional context, these performers' decisions to return the deposits under materially different circumstances are not particularly helpful to VFLA's position.

VFLA also relies on an e-mail exchange between Ellie Goulding's representative and her agent in which they discuss returning the deposit in light of the COVD-19 pandemic. VFLA argues this is strong evidence in support of its interpretation. However, in doing so, VFLA ignores other evidence from the artists that the agent had limited knowledge of the force majeure provision, and then in subsequent e-mails he advised the representative that Ellie Goulding could retain the deposit, and that other WME clients would be doing so under the disputed terms of the force majeure provision.

VFLA also cites to Lizzo's statement that she would be "ready, willing, and able" to perform as soon as the government said she could. Again, we do not find this evidence particularly persuasive to either side's reading. Indeed, the statement is consistent with the artists' "but for" interpretation—that COVID-19 and the government shutdowns were the only thing impeding

Lizzo's performance but that she was otherwise ready, willing, and able to perform.

VFLA also cites evidence that WME negotiated other contracts containing force majeure provisions, which contained the "but for" language that the artists urge us to adopt here. However, there was no evidence that either Gaches or Epstein had access to or compared these other contracts with the Baja Fest or Virgin Fest riders. Further, Gaches explained he used the term "otherwise" as a plain language synonym for "but for." Thus, without some connection between the other contracts using the "but for" language and the agreements here, such evidence is of little value.

Accordingly, the parol evidence VFLA asserts supports its interpretation of the force majeure provision is more or less equally supportive of the artists' reading. However, the only parol evidence that unambiguously supports either side's position is Gaches's revision making the force majeure provision more artist-friendly and, to at least some extent, shifting the risk of a force majeure cancellation from the artist to the festival organizer. When combined with the actual language of the force majeure provision, Gaches's revision tips the parol evidence in favor of the artists.

## IV. The artists' factual showing was sufficient

VFLA argues that, even if we accept the artists' interpretation of the force majeure provision, we should still vacate the trial court's grant of summary judgment because the artists failed to make a sufficient factual showing that they were ready, willing, and able to perform but for the force majeure event. This argument is without merit.

First, VFLA never argued this below. Throughout its briefing, VFLA consistently argued the artists could not show they were "ready, willing, and able" because the COVID-19 pandemic

25

and resulting government orders prevented them from doing so as a matter of law. In other words, VFLA argued its interpretation of the force majeure was the correct one and, under that interpretation, the artists could never show they were otherwise ready, willing and able to perform under the circumstances. Accordingly, we find VFLA's argument forfeited. (*Meridian Financial Services, Inc. v. Phan*, *supra*, 67 Cal.App.5th at p. 698.)

However, even if VFLA preserved this argument, it is not grounds to remand the matter for a bench trial because VFLA never alleged this alternative theory in its pleadings.

"The pleadings play a key role in a summary judgment motion. ' "The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues . . . " ' and to frame 'the outer measure of materiality in a summary judgment proceeding.' [Citation.] As our Supreme Court has explained it: 'The materiality of a disputed fact is measured by the pleadings [citations], which "set the boundaries of the issues to be resolved at summary judgment." [Citations.]' [Citation.] Accordingly, the burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability as *alleged in the complaint*; that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings." (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493.)

Like its briefing in the underlying cross-motions, VFLA's operative complaint only claims the artists could not satisfy the condition that they were ready, willing, and able to perform in the face of the COVID-19 pandemic. Indeed, VFLA demanded the deposits based on its unilateral interpretation of the force majeure provision and never inquired whether the artists were otherwise ready, willing, and able to perform. Then, neither VFLA's operative

26

pleading nor its subsequent briefing asserted that the artists were not ready, willing, and able to perform due to some other impediment unrelated to the COVID-19 pandemic. Thus, whether the artists made such a factual showing under their own interpretation of the force majeure provision is irrelevant.[6] (*Hutton v. Fidelity National Title Co.*, *supra*, 213 Cal.App.4th at p. 493.)

## V. The artists' interpretation does not result in a forfeiture or penalty

VFLA also argues we must adopt its interpretation of the force majeure provision because the artists' interpretation would work an invalid forfeiture or penalty. We disagree.

" 'A forfeiture is "[t]he divestiture of property without compensation" or "[t]he loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty." ' " (*Brandenburg v. Eureka Redevelopment Agency* (2007) 152 Cal.App.4th 1350, 1364.) " 'Forfeitures are not favored by the courts, and, if an agreement can be reasonably interpreted so as to avoid a forfeiture, it is the duty of the court to avoid it. The burden is upon the party claiming a forfeiture to show that such was the unmistakable intention of the instrument. [Citations.] "A contract is not to be construed to provide a forfeiture unless no other interpretation is reasonably possible." ' " (*Universal Sales Corp. v. California Press Mfg. Co.* (1942) 20 Cal.2d 751, 771.)

The artists' interpretation does not work a forfeiture here. In at least one respect, VFLA's argument is missing a hallmark of

---

[6] Because we find that VFLA forfeited this argument and the issue is otherwise irrelevant based on the pleadings, we do not address VFLA's evidentiary objections to Lizzo's testimony under Code of Civil Procedure section 2025.260, subdivision (c).

27

forfeiture, which is a breach by the forfeiting party, i.e., VFLA. (See *Nelson v. Schoettgen* (1934) 1 Cal.App.2d 418, 423; *Smith v. Baker* (1950) 95 Cal.App.2d 877, 884.) Here, VFLA merely disagrees with the artists' interpretation of the force majeure provision and how it allocated risk between the parties. And, while VFLA and the artists disagree as to when they were to bear the risk of a force majeure cancellation, it was the "unmistakable intent" of the parties that the risk of a force majeure cancellation should be reflected in the determination of who was ultimately entitled to the deposits. (See *Universal Sales Corp. v. California Press Mfg. Co.*, *supra*, 20 Cal.2d at p. 771.) Because there has been no breach and the parties clearly intended to allocate risk with respect to a force majeure cancellation, VFLA's forfeiture argument is unconvincing.

Moreover, while we acknowledge a breach is not a necessary element of a forfeiture, we note the circumstances here also lack a second indicator of a forfeiture or penalty, which is an unfair divestiture of property that bears no relationship to the actual damages anticipated by the parties when they negotiated the contracts. (*Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.* (2015) 232 Cal.App.4th 1332, 1337–1338.) For example, although not constituting a breach, a failure to satisfy a condition may constitute a forfeiture when the value of the property forfeited bears no reasonable relationship to the range of anticipated harm when that condition is not satisfied. (*Ibid*.) We must prioritize the substance of the parties' agreement over its form, and compare the value of the forfeited property with the range of harm anticipated by the parties at the time of contracting. (*Ibid*.)

Here, when we compare the value of the property forfeited, i.e., the deposits, with the range of harm anticipated by the parties at the time of contracting, for example, the artists' lost opportunity

to publicly perform in the Los Angeles area around the time of Virgin Fest, the two amounts bear a reasonable relationship to each other.  The amount of the deposits, which represented the artists' fee for their Virgin Fest performances, is what these artists could command from VFLA because they also gave up their right to put on competing public performances in and around Los Angeles in the summer of 2020.  Thus, the amount of the deposits bore a reasonable relationship to the anticipated range of harm caused by Virgin Fest's cancellation.  (See *Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.*, *supra*, 232 Cal.App.4th at pp. 1337–1338.)

VFLA claims that it received nothing for the deposits.  However, this claim is belied by the record, which demonstrates VFLA bargained for more than the artists' performances at Virgin Fest.  Rather, the performance contracts also granted VFLA valuable exclusivity rights that prohibited the artists from publicly performing or even publicly announcing any other competing performances within a certain time and within a certain geographical area of Virgin Fest.

We are also not persuaded by VFLA's argument that the condition that the artists be "otherwise ready, willing, and able" must be strictly interpreted against the artists under Civil Code section 1442, which provides:  "A condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created."

As we have concluded above, the artists' interpretation of the force majeure provision does not work a forfeiture, therefore, Civil Code section 1442 does not apply.

However, even assuming Civil Code section 1442 applies, it does not support VFLA's argument.  This is because the condition was created for VFLA's benefit, not the artists.  It is the artists who

must satisfy the condition they are "otherwise ready, willing, and able to perform" so as not to receive a windfall if they cancelled their performance for reasons independent of the force majeure. Thus, Civil Code section 1442 requires us to construe the condition that the artists be "otherwise ready, willing, and able to perform" against VFLA because it is the artists who must satisfy that condition. (See *Conolley v. Power* (1924) 70 Cal.App. 70, 75–76.) To hold otherwise would allow a party to use Civil Code section 1442 to obscure a contractual condition, making it more difficult for the other party, who must satisfy the contractual condition, from having a clear understanding of how that condition can be satisfied.

## VI. The artists' interpretation does not make the performance contracts unlawful

VFLA argues the artists' interpretation of the force majeure provision is also untenable because it requires this court to endorse an illegal act or enforce a contract with an unlawful object, specifically, allowing the artists to say they were "ready, willing, and able" to perform despite the COVID-19-related restrictions prohibiting their performances. Again, we are not persuaded.

Every contract must have a lawful object. (Civ. Code, § 1550.) "The object of a contract is the thing which it is agreed, on the part of the party receiving the consideration, to do or not to do." (Civ. Code, § 1595.) "Where a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void." (Civ. Code, § 1598.) "Where an agreement is capable of being interpreted in two ways," we should construe it in order to make the agreement lawful and capable of being carried into effect. (*Segal v. Silberstein* (2007) 156 Cal.App.4th 627, 633.) In determining whether the subject of a

30

given contract is lawful, we rely on the state of the law as it existed at the time of contracting. (*Moran v. Harris* (1982) 131 Cal.App.3d 913, 918.)

VFLA argues the performance contracts had a single object—the artists' performances at Virgin Fest—which became unlawful as a result of the government's COVID-19 orders. Therefore, according to the VFLA, the contracts are void, or, alternatively, we must reject the artists' interpretation because it would allow the artists to assert they were "ready" and "able" to perform an illegal act. Neither argument has merit.

First, as discussed above, we disagree with VFLA's characterization that the artists' performance at Virgin Fest was the performance contracts' only object, as VFLA also bargained for valuable exclusivity rights, which the artists granted.

Second, nothing in the force majeure provision requires the artists to actually perform and violate COVID-19 restrictions, thus, the artists are not asking us to help them carry out an illegal object. By adopting the artists' interpretation, we are not endorsing or requiring the artists to perform an illegal act. Rather, our interpretation of the force majeure provision merely requires us to decide who is entitled to the deposits in the event of a force majeure cancellation.

Third, the record is clear that the performance contracts did not have an unlawful object at the time of contracting. It was only after the government issued its COVID-19 restrictions that the artists' performances at Virgin Fest became unlawful. "[I]f the contract was valid when made, no subsequent act of the legislature can render it invalid." (*Stephens v. Southern Pac. Co.* (1895) 109 Cal. 86, 95.)

31

VFLA asserts that *Indus. Devl. & Land Co. v. Goldschmidt* (1922) 56 Cal.App. 507 (*Goldschmidt*) forecloses the artists' position that they were "ready, willing, and able to perform" at Virgin Fest after the government orders prohibited their performances. We find *Goldschmidt* distinguishable.

In *Goldschmidt*, a landlord sued his commercial tenants who stopped paying rent after prohibition made illegal their winery and liquor business operation on the property. (*Id*. at pp. 134–135.) The *Goldschmidt* court held that the tenants were excused from performance, i.e., paying rent for the remainder of the lease term, when prohibition came into effect and made operating their business unlawful. (*Id*. at pp. 508–509.) A critical factor in *Goldschmidt* was the lease's restrictive terms, which provided the property could not be used for any other purpose other than a winery and liquor business. (*Id*. at p. 135.) "The restrictive clauses make it appear definitely enough that the lessees were bound to use the premises for the purpose of conducting a winery or wholesale or retail liquor business, or for all of such purposes, and that such uses could not be varied at their option." (*Id*. at p. 511.) Because the lease's terms were restrictive, the *Goldschmidt* court concluded the lease became inoperative upon the enactment of prohibition. (*Id*. at pp. 510–511.)

Unlike the restrictive lease in *Goldschmidt*, the performance contracts here anticipated the possibility of a force majeure cancellation, and allocated the financial risk between the parties accordingly. It is not illegal for parties to negotiate what happens when a condition under a contract becomes impossible. (*Mathes v. Long Beach* (1953) 121 Cal.App.2d 473, 477.)

VFLA also argues the "ready, willing, and able" condition is void under Civil Code section 1441, which provides that "[a]

32

condition in a contract, the fulfillment of which is . . . unlawful," is "void." We disagree. As discussed above, the relevant inquiry is whether the artists were "otherwise ready, willing, and able" absent the force majeure, not whether they could perform in violation of the COVID-19 restrictions. As such, nothing in the performance contract requires the artists to satisfy an unlawful condition.

## VII. Because VFLA's contract claim fails, its breach of the implied covenant of good faith and fair dealing claim fails as well

Given our finding that the artists' interpretation of the force majeure provision is the correct one, we conclude the artists also prevail on VFLA's cause of action for breach of the implied covenant of good faith and fair dealing.

" ' "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." ' " (*Carma Developers* (*Cal.*)*, Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371.) A party need not show a specific breach of the contract to prove a claim for breach of the implied covenant of good faith and fair dealing. (*Ibid*.) "Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract." (*Id*. at p. 373.) Nonetheless, "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." (*Ibid*.) "[T]he implied covenant of good faith is read into contracts 'in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.' " (*Ibid*.) The implied covenant will not "be read to prohibit a party from doing that which is expressly permitted by an agreement." (*Id*. at p. 374.) Thus, " 'the parties may, by express

33

provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing.' " (*Ibid.*) In other words, no covenant of good faith and fair dealing can be implied which forbids acts and conduct expressly authorized by the contract. (*Ibid.*)

The plaintiff "must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395.)

Here, VFLA points to various instances of bad faith conduct by the artists. These include a statement from a WME representative that it was treating Virgin Fest as a "money grab," Lizzo's endorsement of an open letter calling for the music industry to pause in order to curb the spread of COVID-19, WME's statement to Felts that the performance contracts were "pay or play" agreements negotiated "under the strictest terms" because Virgin Fest's potential success was doubtful, Kali Uchis's decision to return the deposit to the other festival organizer, and a statement from Ellie Goulding's management expressing doubt she "would be able to pull [her] show together in time for [Virgin Fest]."

None of these examples, if proven, are sufficient to show the artists breached the implied covenant of good faith and fair dealing. They do not demonstrate the artists' failure or refusal to discharge

34

contractual responsibilities which frustrated the reasonable expectations of VFLA under the performance contracts. (*Careau & Co. v. Security Pacific Business Credit, Inc.*, *supra*, 222 Cal.App.3d at p. 1395.) Instead, what occurred here is both sides took a hardline but good faith position with respect to the force majeure provision, which they were entitled to do. Moreover, it was the COVID-19 pandemic, not any actions by the artists, that interfered with VFLA's expectations under the performance contracts. As far as Lizzo's call for the music industry to shut down during the pandemic and Ellie Goulding's management's statement that she may not be able to pull together her performance in time, those statements had no bearing on Virgin Fest's cancellation, which is what ultimately caused the harm to VFLA. (See *Floystrup v. City of Berkeley Rent Stabilization Bd.* (1990) 219 Cal.App.3d 1309, 1318.)

## VIII. WME's motion for summary judgment

Because VFLA conceded if the artists prevailed, WME should prevail as well, we also affirm the trial court's grant of summary judgment in favor of WME.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.


VIRAMONTES, J.

WE CONCUR:



STRATTON, P. J.



WILEY, J.